MITCHELL D. GLINER, ESQ.
Nevada Bar No. 3419
3017 West Charleston Blvd., #95
Las Vegas, Nevada 89102
702-870-8700
702-870-0034 FAX
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Diana Owen Smith,                    )
                                     )
            Plaintiff,               )        NO. 2:05-cv-1236-LDG-RJJ
                                     )
v.                                   )        **ORAL ARGUMENT REQUESTED**
                                     )
Ohio Savings Bank,                   )
  F.S.B.                             )
                                     )
            Defendant.               )
_____)

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff requests that Defendant's Motion for Summary Judgment be denied in all respects. Nowhere in its brief has Defendant either addressed the very specific, substantive reporting requirements of the FCRA or that its reporting is literally contrary to established industry standards. It has merely tied its amorphous position to Nevada's status as a community property state.

The issue underlying Plaintiff's motion practice is very narrow and straightforward. Plaintiff requests this Honorable court find that Defendant's wide-spread practice of annotating consumer credit profiles with bankruptcy notations notwithstanding that some consumers, including Ms. Smith, never declared bankruptcy

1  is inherently misleading. The Honorable Lloyd D. George, Senior
2  United States District Court Judge, has previously found that this
3  very type of reporting which fails to "adequately and sufficiently
4  identify that the [underlying account is] included in the
5  bankruptcy" of the party which actually filed the bankruptcy is
6  inherently misleading, Spellman v. Experian Information Solutions,
7  Inc., 2002 WL 799876 (Exhibit 1).[1]

8      Finally, Defendant has pointedly asserted that its reporting
9  was at all times accurate. However, it has provided absolutely no
10 explanation why it removed the disputed bankruptcy notation from
11 Plaintiff's credit profiles just after this lawsuit was filed and
12 served.

13                                I.

14             **MEMORANDUM OF POINTS AND AUTHORITIES**

15     Summary judgment is appropriate when there are no genuine
16 issues of material fact and the moving party is entitled to
17 judgment as a matter of law. Fed. R. Civ.P. 56(c). The initial
18 burden is on the moving party to show that there is an absence of
19 genuine issues of material fact. *Celotex Corp. V. Catrett*, 477 U.S.
20 317, 325, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986). If the moving
21 party meets its initial burden then the nonmoving party must set
22 forth specific facts showing that there is a genuine issue for
23 trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106
24 S.Ct. 2505, 91 L.Ed 2d 202 (1986). In deciding a motion for
25 summary judgment, the court views the evidence of the non-movant in
26 the light most favorable to that party, and all justifiable

27

28      [1] Counsel for Plaintiff represented Mr. Spellman.

                              -2-

1  inferences are also to be drawn in its favor.   *Id*. At 255, 106
2  S.Ct. 2505.

3                                  II.

4              **INTRODUCTION AND UNCONTROVERTED FACTS**

5       As noted, this case is very straightforward.  Plaintiff has
6  never filed bankruptcy.    Further, as Defendant quite openly
7  expressed in its motion for summary judgment filed December 7,
8  2007,  pages  2-4,  Defendant  responded  to  Plaintiff's  various
9  disputes, conveyed through the national credit reporting agencies,
10  "by indicating that the bankruptcy notation was proper. . ."  *Id*.,
11  page 4, lines 17-18.    Defendant premised this conclusion on the
12  2004 bankruptcy filing of *Plaintiff's spouse*.    Thus, the only
13  question raised is whether this practice is inaccurate in violation
14  of the FCRA.

15      Congress enacted the FCRA in 1970 as Title VI of the Consumer
16  Credit Protection Act, 15 U.S.C. §§ 1601-1693r (CCPA), the plenary
17  regulation of the national consumer credit industry.    Consumer
18  credit has expanded over one hundred fold in the last fifty years
19  and is now one of the largest sectors of the national economy.
20  Growing from six billion dollars at the end of World War II,
21  outstanding consumer credit debt rose to 116 billion dollars in
22  1970 when Congress enacted the FCRA and by 1993 reached over 700
23  billion dollars.  S. Rep. 103-209, 103d Cong., 1st Sess. 2-3 (1993).
24  To  support  this  phenomenal  level  of  activity,  the  consumer
25  reporting industry maintains 450 million credit files on more than
26  110 million individuals, virtually the entire adult population of
27  the country, and processes almost 2 billion pieces of data per
28  month.  *Id.*, at 3.  In view of the demonstrated potential for error

                                  -3-

1  in operating this informational maze, Congress adopted the FCRA
2  with the explicit recognition that the health of the consumer
3  banking system is "dependent upon fair and accurate credit
4  reporting" and that "[i]naccurate credit reports directly impair
5  the efficiency of the banking system." 15 U.S.C. § 1681(a)(1).

6      A recurring theme which is at the heart of the CCPA is that
7  the dissemination of accurate credit information is essential to
8  maintain the vitality of the credit granting system for the benefit
9  of creditors and consumers alike.  Just as Congress enacted the
10 FCRA with the express purpose that credit grantors be in the best
11 position to make reliable credit granting decisions, the Truth in
12 Lending Act, 15 U.S.C. §§ 1601-1667e, Title I of the CCPA (TILA),
13 establishes the corresponding principle through its disclosure
14 requirements that consumers are best served through their own
15 "informed use of credit." 15 U.S.C. § 1601(a).  In addition to the
16 FCRA and TILA, Congress has included a further self-help checking
17 mechanism within the CCPA as Title VII, the Equal Credit
18 Opportunity Act, 15 U.S.C. §§ 1691-1691f, providing yet another
19 information sharing standard through its core requirement that
20 creditors disclose, and consumers receive, the specific reasons for
21 any adverse action taken, such as credit denial.   15 U.S.C. §
22 1691d.

23     The Supreme Court succinctly stated this guiding principle of
24 this congressional philosophy nearly thirty years ago in its
25 initial and seminal teaching under the CCPA: "[B]lind economic
26 activity is inconsistent with the efficient functioning of a free
27 economic system such as ours."  *Mourning v. Family Publication
28 Service, Inc.*, 411 U.S. 356, 364 (1973).  The 1996 amendments to

-4-

the FCRA were adopted with the recognition that credit decisions made in ignorance or without the benefit of accurate information, whether made by credit grantors or consumers, undermine the vitality of the consumer economy.

Unfortunately, despite the intent and best efforts of Congress in adopting the FCRA, accurate information was not being consistently provided by the consumer reporting system to its credit granting clientele. In the deliberations that culminated with enacting the 1996 amendments, Congress was presented with the staggering statistic that nearly half of all consumer reports (48%) maintained by the three major consumer reporting agencies contain inaccurate information. S. Rep. 103-209, *supra*, at 3. By 1996, Congress was poised to reform and strengthen the credit reporting system that it had left essentially untouched for twenty-five years. *Id.*, at 2.

In 2002 our Court of Appeals specifically ruled that the 1996 Amendments confer a private right of action for violations of FCRA § 1681s-2(b), *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057 (9th Cir. 2002). [2] In *Nelson* Circuit Judge Noonan provided a pointed synopsis (*Id.*, 1058) referencing Chase's virtually identical practice of reporting the bankruptcy of a consumer on the credit profile of a non-filer.[3]

---

[2] Counsel for Plaintiff represented Mr. Nelson.

[3] It should be noted that Messrs. Spellman and Nelson were at least co-borrowers on the respective notes underlying their lawsuits. Here Plaintiff's spouse, James Smith, *only* filed bankruptcy and was not even a signatory to the note which underlies Plaintiff's claims.

1                                      III.

2                                   **ARGUMENT**

3   **A.   On January 13, 2005, Defendant denied Plaintiff credit due to**

4   **the ostensible "bankruptcy" on her credit profile.**

5

6        As alleged in the Complaint Plaintiff applied for additional

7   financing with Defendant during January 2005.   Defendant does not

8   dispute this.   On January 13, 2005, Defendant denied Plaintiff

9   additional credit based upon the ostensible bankruptcy in her

10  credit profile (Complaint, Exhibit 1). There is nothing which more

11  dramatically exposes Defendant's inherently inaccurate reporting

12  than the irony that Defendant itself denied Plaintiff credit due to

13  its own misleading information.   Exhibit 1 to the Complaint is,

14  after all, *Defendant's own document*.

15       On January 10, 2002, the Honorable Lloyd D. George, Senior

16  District Court Judge, rendered a decision on a virtually identical

17  issue in *Spellman v. Experian Information Solutions, Inc.,* 2002 WL

18  799876 (Exhibit 1).  As expressed in footnote 3, Mr. Spellman was

19  at least a co-borrower on the underlying mortgage note.   Here,

20  Plaintiff's spouse filed bankruptcy and was not even a signatory on

21  Plaintiff's account.   Judge George specifically determined that

22  this type of practice was misleading:

23                     "By failing to adequately and sufficiently
                       identify that the mortgage was included in the
24                     bankruptcy of *only* the joint holder, Kathleen
                       Spellman, and by failing to adequately and
25                     sufficiently identify that *only* the liability
                       of the joint holder was discharged by
26                     bankruptcy, the report can mislead the reader
                       to the inaccurate conclusion that Spellman
27                     included the mortgage in his bankruptcy (<u>and</u>
                       <u>thereby inaccurately implying that he *had*</u>
28                     *declared bankruptcy*) and that Spellman's

                                   -6-

1
2
3
4

> liability on the mortgage was discharged.  The
> ambiguous statement in the credit report that
> the unidentified "primary borrower" declared
> bankruptcy does not cure but amplifies the
> misleading nature of the report as it concerns
> Spellman's credit history regarding the
> mortgage."

5   Further, Defendant's own policies and procedures proscribe
6   this precise conduct in accordance with the relevant industry
7   standard.  In response to Plaintiff's discovery requests Defendant
8   produced its Policy and Procedures Manual.  An excerpt from that
9   Manual is provided as Exhibit 2.  Exhibit 2 provides a very brief
10  synopsis of Metro-2 formatting engendered by industry to establish
11  uniform reporting standards.  Exhibit 2 also provides the specific
12  industry standard relating to the reporting of a bankruptcy on the
13  credit report of a non-filer.  Defendant's own Manual indicates
14  under Frequently Asked Questions the consumer information
15  indicators (CII) must be left blank on the credit report of a non-
16  filer and that the CII is the "critical" piece of information.  In
17  other words, a furnisher of information is prohibited from
18  reporting a bankruptcy notation on the credit profile of a consumer
19  who has not filed bankruptcy.

20  As noted, Metro-2 software is used by industry to establish
21  applicable uniform standards:

22      Metro 2 is a reporting format used by furnishers to
23      provide information about consumer accounts to consumer
24      reporting agencies.  The Metro format software has been
25      around since the 1970s.  Metro 2 is the version created
26      after the 1996 amendments to the Fair Credit Reporting
27      Act.  It was designed by the credit reporting industry,
28      including the so-called "Big Three": Equifax, Experian,
        and Trans Union.  The program and instructions are
        available for users from the Associated Credit Bureaus,
        Inc., an industry trade association, and from each of the
        major reporting agencies.  While Metro 2 is the current
        industry standard for furnishing consumer information to
        reporting agencies, some creditors may still be using an

earlier version.  <u>Fair Credit Reporting Act, 5th Edition,</u>
<u>page 56, National Consumer Law Center, 2002</u>.

Here Defendant has adopted on a widespread basis reporting
practices prohibited by industry standards as exemplified by its
very own Policy Manual.

**B.  Defendant has adopted a "technical accuracy" defense which has**
**been discredited by the Courts.**

Any mere technical accuracy of Defendant's reporting does not
achieve FCRA compliance.  The FCRA requires more than technical or
literal accuracy; it requires "maximum possible accuracy of the
information concerning the individual <u>about whom the report</u>
<u>relates</u>."  § 1681e(b).  To ensure that reporting agencies meet this
exacting standard, the FCRA authorizes a consumer to institute the
dispute process as Plaintiff did here to challenge the
"completeness or accuracy" of any reported item.  § 1681i(a)(1)(A).
Failing to identify that Plaintiff never declared bankruptcy,
particularly when she is the consumer on whose report the entry
appears, is quintessentially inadequate to satisfy the FCRA's
standards.

The District of Columbia Circuit has condemned this type of
incomplete and misleading entry:

> First of all, we do not agree with the district court
> that section 1681e(b) makes a credit reporting agency liable
> for damages only if the report contains statements that are
> technically untrue.  Congress did not limit the Act's mandate
> to reasonable procedures to assure only technical accuracy; to
> the contrary, the Act required reasonable procedures to assure
> "maximum accuracy."  The Act's self-stated purpose is "to
> require that consumer reporting agencies adopt reasonable
> procedures for meeting the needs of commerce for consumer
> credit . . . in a manner which is fair and equitable to the
> consumer, with regard to the confidentiality, accuracy,
> relevancy, and proper utilization of such information."  15

U.S.C. 1681e(b). <u>Certainly reports containing factually
correct information that nonetheless mislead their readers are
neither maximally accurate nor fair to the consumer who is the
subject of the reports.</u>

. . . .

Applying that interpretation in this case, we find that
the district court's dismissal of the Koropoulos' claims by
summary judgment on the grounds that the information in the
report was technically accurate, regardless of any confusion
generated in the recipients' minds as to what it meant, was
improper. We find there is a genuine issue of fact as to
whether the report was sufficiently misleading so as to raise
the issue of whether CBI's procedures for assuring "maximum
possible accuracy" were reasonable.

*Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40, 42 (D. C. Cir.
1984).

The Fifth Circuit explained Congress' rejection of a mere

technical accuracy standard under circumstances where a consumer

report stated with regard to the consumer's account, "Litigation

Pending:"

Turning to liability under § 1681e(b), any person could easily
have construed the notation "Litigation Pending" as an
indication that the plaintiff was being sued by Sherwin-
Williams, while the actual situation was the reverse. It
would have been a simple matter to prevent this ambiguity,
particularly in light of Chilton's knowledge of Pinner's
dispute with Sherwin-Williams.

*Pinner v. Schmidt*, 805 F. 2d 1258, 1262-63 (5th Cir. 1986).

Other courts agree that even "a technical truth . . . can be

as misleading as an outright untruth where it paints a misleading

picture." *Swoager v. Credit Bureau of Greater St. Petersburg*, 608

F. Supp. 972, 977 (M.D. Fla. 1985) (entry misleadingly coded). In

*Alexander v. Moore & Associates, Inc.*, 553 F. Supp. 948, 952 (D.

Haw. 1982), the court posited another example illustrative of the

defect in Defendant's "corrected" entry:

[Section 1681e(b)] does not require that a consumer reporting
agency follow reasonable procedures to assure simply that the
consumer report be "accurate," but to assure "*maximum possible*

-9-

*accuracy*".  Otherwise it would seem that a consumer reporting
agency could report that a person was "involved" in a credit
card scam, and without regard to this section fail to report
that he was in fact one of the victims of the scam.  This
result cannot have been contemplated under the Act.

The Fourth Circuit agrees that "A report is inaccurate when it

is 'patently incorrect' or when it is 'misleading in such a way and

to such an extent that it can be expected to [have an adverse]'

effect.  *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th

Cir. 1998)." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d

409, 415 (4th Cir. 2001) (if report could be read as stating that

Dalton was found guilty of a felony, when he pled to a

misdemeanour, its inaccuracy would be established).  As applied to

this case, if the report could be read as stating that Plaintiff

had filed bankruptcy, its inaccuracy is established.

The standard for accuracy under the FCRA is not *sui generis*.

This type of critical omission of a material fact also constitutes,

for example, misrepresentation under common law (Restatement of

Torts (Second), §§ 529, 551) and deception under the Federal Trade

Commission Act of 1934.  *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146,

1154 (9th Cir. 1984) ("failure to disclose material information may

cause an advertisement to be deceptive, even if it does not state

false facts"); *Simeon Management Corp. v. FTC*, 579 F.2d 1136, 1146

(9th Cir. 1978) (deceptive to omit material fact which could affect

the consumer's decision to buy); *Resort Car Rental System, Inc. v.*

*FTC*, 518 F.2d 962, 964 (9th Cir. 1975) (trade name Dollar-A-Day has

a decisive connotation which is deceptive).

The bankruptcy notation here utterly fails to meet the FCRA

standard that the consumer report must be complete, accurate, and

not misleading.  In addition, however, the Court of Appeals has

-10-

recognized that the FCRA requires that the report must also be relevant to the subject consumer:

> The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information <u>about them</u>, (citations omitted) and to establish credit reporting practices that utilize accurate, <u>relevant</u> and current information in a confidential and responsible manner.

*Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (emphasis added); *Hansen v. Morgan*, 582 F.2d 1214, 1220 (9th Cir. 1978).

The purpose of the FCRA is to ensure that the needs of commerce are met "in a manner which is fair and equitable to the consumer, with regard to the . . . accuracy [and] relevancy" of information about the consumer. § 1681(b). A consumer report is one which "bear[s] on a consumer's credit worthiness, credit standing, credit capacity," and other individualized characteristics and which is to be used "as a factor in establishing the consumer's eligibility" for credit, employment, and other permissible purposes. § 1681a(d)(1). The consumer reporting agency must follow procedures to "assure maximum possible accuracy of the information <u>concerning the individual about whom the report relates</u>." § 1681e(b) (emphasis added). A common thread throughout the FCRA is that a consumer report relates to the individual consumer. *E.g.*, § 1681q ("information on a consumer"); § 1681r ("concerning an individual").

Someone else's bankruptcy does not bear on Plaintiff's credit worthiness or the other personal characteristics recited in § 1681a(d)(1). Just as Defendant did in this case, the FCRA presumes that a bankruptcy reported on a consumer's file belongs to that

-11-

1  consumer.   Indeed, a separate section of the FCRA contains special

2  rules regarding bankruptcy entries with specific reference to "a

3  consumer report that contains information regarding <u>any case</u>

4  <u>involving the consumer</u> that arises under Title 11."  § 1681c(d)

5  (emphasis added).

6      Including Mr. Smith's bankruptcy on Plaintiff's consumer

7  report violates the completeness and accuracy as well as the

8  relevancy requirements of the Act, which protects Plaintiff, whose

9  payments remained current, from being tarnished by someone else's

10  bankruptcy.   As Congress recognized, "Inaccurate credit reports

11  directly impair the efficiency of the banking system."    §

12  1681(a)(1).   Defendant's apparent argument that the FCRA is

13  satisfied when a report is technically accurate, even though it is

14  incomplete, misleading, and unrelated to the consumer, is contrary

15  to <u>its own interest</u> in the efficiency of the banking system.

16                              **IV.**

17      **IT IS ESSENTIAL THAT DEFENDANT "SPEAK THE SAME LANGUAGE"**

18          **AS THE REMAINDER OF THE CREDIT INDUSTRY**

19      In <u>Cassara v. DAC Services, Inc.</u>, 276 F.3d 1210, 1225 (10th

20  Cir. 2002), the 10th Circuit recognized the essential nature of a

21  common industry language, standard and reporting framework

22  prerequisite to maximizing the accuracy of information contained in

23  a consumer's report.   Here, the Defendant failed to comport with

24  the industry standard, notwithstanding evident means to achieve it.

25              But if employers in that industry are to
                communicate meaningfully among themselves
26              within the framework of the FCRA, it proves
                essential that <u>they speak the same language</u>,
27              and that important data be reported in
                categories about which there is genuine common
28              understanding and agreement.  Likewise, if DAC

                              -12-

is to "insure maximum possible accuracy" in the transmittal of that data through its reports, it may be required to make sure that the criteria defining categories are made explicit and are communicated to all who participate.   Id.

Here, Defendant's departure from the established industry standard was not just misleading in the abstract.   Explicitly, empirically, <u>Defendant's own reporting</u> mislead it into concluding that Plaintiff had indeed filed bankruptcy (Complaint, Exhibit 1). Thus, Defendant's obdurate refusal to speak "the same language" to which the rest of the banking community subscribes, has resulted in a continued prejudice of Plaintiff's rights.

Attached respectively as Exhibits 3 and 4 are the Second Modified Stipulation of Settlement and Final Judgment in <u>Clark vs. Equifax Information Services LLC</u>. *Clark* was a class action filed in April, 2000 against Equifax, Experian and Trans Union for the precise erroneous reporting which continues to underlie Defendant's illegal practices.   In 2003, the national credit reporting agencies agreed to reform their practices to insure that no reference to bankruptcy would appear on any tradeline absent either public record of a bankruptcy or language that the bankruptcy filing referenced is that of another person (Exhibit 3, pages 6-7).

A copy of the Final Judgment against Equifax is also attached (Exhibit 4).   Identical judgments were entered against both Experian and Trans Union and cumulative attorney's fees of $15 million were awarded.

-13-

**V.**

**DEFENDANT'S OWN WITNESS COULD NOT EXPLAIN WHY**

**DEFENDANT REMOVED THE BANKRUPTCY NOTATION FROM PLAINTIFF'S**

**CREDIT PROFILES THE MONTH AFTER PLAINTIFF'S LAWSUIT**

**WAS FILED**

This action was filed October 12, 2005. Defendant was served on October 18, 2005. The following month Defendant instructed the national credit reporting agencies to remove the bankruptcy notation from Plaintiff's credit profiles. Attached as Exhibit 5 is the condensed deposition of Defendant's own corporate designee, George Peters. Page 10 of the condensed transcript encompasses pages 34-37 of the original 57 page transcript.

Mr. Peters indeed testified that the bankruptcy was no longer being reported and that it had been removed in November, 2005. When pressed as to why it had been removed, notwithstanding the apparent contradiction, Mr. Peters responded he could not answer. Mr. Peters was also asked to supplement his testimony upon review of the transcript. No supplemental response regarding just why Defendant removed the bankruptcy notation it was "required" to report has been provided (Exhibit 5, page 10 (34-37)). Assuming Defendant has somehow correctly asserted that it was indeed required to report the bankruptcy notation on Plaintiff's credit profiles, then the removal of that notation necessarily requires a conclusion that Defendant is *currently* misreporting Plaintiff's account. Of course this is patently absurd. The foregoing simply illustrates not only Defendant's inconstancy, but also, the premise that it can't have it both ways.

-14-

1     VI.

2     **CONCLUSION**

3         Plaintiff respectfully requests that Defendant's Motion for

4     Summary Judgment be denied in all respects.

5                             Respectfully submitted,

6

7                             _____/s/_____
                              MITCHELL D. GLINER, ESQ.
8                             Nevada Bar No. 3419
                              3017 W. Charleston Blvd., #95
9                             Las Vegas, NV 89102
                              Attorney for Plaintiff
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-